IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| PAMELA CLEMONS, | ) |
| | ) |
| Plaintiff, | ) Civil Case No. 06-1209-KI |
| | ) |
| vs. | ) OPINION AND ORDER |
| | ) |
| NIKE, INC., an Oregon corporation, and | ) |
| DOROTHY CLINGMAN, an individual, | ) |
| | ) |
| Defendants. | ) |
| | ) |

Craig A. Crispin
Shelley D. Russell
Crispin Employment Lawyers
500 Plaza West, 9600 S.W. Oak Street
Portland, Oregon  97223

       Attorneys for Plaintiff

Amy Joseph Pedersen
P.K. Runkles-Pearson
Stoel Rives LLP
900 S.W. Fifth Avenue, Suite 2600
Portland, Oregon  97204

       Attorneys for Defendants

Page 1 - OPINION AND ORDER

KING, Judge:

Plaintiff Pamela Clemons worked for defendant NIKE, Inc. when her supervisor, defendant Dorothy Clingman, accused Clemons of abusing her travel privileges and terminated her after reviewing Clemons' history of communication problems. Clemons alleges that the stated reason for the termination was a pretext and the real reason was discrimination and retaliation. Before the court is Defendants' Motion for Summary Judgment (#32). For the reasons below, I dismiss all claims except for age discrimination.

## FACTS

NIKE hired Clemons in June 2000 as a Senior Employee Relations ("ER") Specialist. ER Specialists are assigned business groups within NIKE for which they provide training, advice, and support on employee issues such as discrimination and harassment complaints, leave requests, disability accommodation, and performance management. Defendant Dorothy Clingman, who is 17 months younger than Clemons, became Clemons' supervisor after July 2002 when Clingman was promoted to ER Director. Global Director of ER Tracy Healy was Clingman's supervisor. Natasha Oilar also supervised Clemons for a period. Lee Bercot is an ER Specialist who worked with Clemons and is two years younger than she is.

I.   Written Performance Documents

Clemons' December 2000 performance review, prepared by Rick Howell, stated under the area of Coaching, Consulting and Leadership that timeliness and thoroughness were a concern. The review stated that Clemons could be "attacking when frustrated" and asked Clemons to be careful to keep her manager, the complainant, and the business group informed. Pedersen Decl. Ex.1 at 118. Just prior to the review, in November 2000, Howell gave Clemons a written Record of Coaching which stated that her performance was not meeting expectations and

Page 2 - OPINION AND ORDER

that she needed to focus on listening skills, results orientation, follow-up, objectivity, investigation skills, and platform skills.

In the June 2001 performance review, prepared by Natasha Oilar, Clemons received an "Achieves" rating but was counseled that she interrupted other speakers at times. Clemons was also asked to keep Oilar more updated and to share more work product with her. In July 2002, Oilar again rated Clemons as "Achieves" but asked her to increase her communication and sharing of work product even more. Oilar did note some improvement had occurred.

Clingman prepared the August 2002 performance review and rated Clemons as "Achieves." In the December 2003 review, Clingman stated, "To further improve/enhance your contribution, we discussed the need to develop a more optimistic ("glass half full") approach with new HR partners . . . ." Pedersen Decl. Ex.1 at 156. Clemons appealed the remark. After a series of emails between the two concerning the review, Clingman agreed to delete that comment but noted that Clemons would do a disservice to herself unless she recognized the value of toning down a frequently argumentative approach with peers and partners.

In August 2004, Clingman had a coaching discussion with Clemons concerning her body language and tone of voice in several specific instances that were perceived as Clemons being on the attack, accusatory and negative, lacking in support for an ER exercise within the group, and an unwillingness to be open to learning. Clemons wrote a lengthy response and discussed her concerns with Healy.

On September 1, 2004, Clingman gave Clemons a Written Reminder summarizing their meeting a week earlier during which Clingman told Clemons that her performance was not meeting NIKE standards. Clingman was concerned that Clemons was not open to constructive

feedback, a position Clingman considered absolutely unacceptable. Clemons appealed the Written Reminder.

In June 2005, Clemons sent Clingman an email asking to work from home the following Monday to wait for an appliance repair person. Clingman responded by asking if she could access email from home and Clemons replied in one word: no. Clingman responded by email, taking Clemons to task that this exchange was a perfect example of the kind of insufficient communication Clingman had complained about in a meeting earlier in the week.

Clingman drafted Clemons' performance review in June 2005. Clingman complained that Clemons lacked proactive involvement in performance management issues in her business units; Clemons' style was perceived as rigid, intimidating, and defensive; and a BOLI response drafted by Clemons had to be rewritten because it was so confusing. Clemons received an "Inconsistent" rating.

II.     Differing Treatment Based on Age

According to Clemons, different ER Specialists received different training, such as attending conferences and classes, with younger employees getting more opportunities. Clemons made three requests to attend a particular national conference and was told each time that there were no funds available for her to attend. She asked twice to attend a Myers-Briggs training and was not allowed to attend. Clemons did not know if the younger employees received extra training because they were younger than she was or because they were less experienced than she was.

Clemons thought the different treatment based on age affected other areas also. She believed that older employees, in particular herself and Bercot, were frequently asked to provide coverage when younger employees went out on family medical leaves. Clemons complains that

Page 4 - OPINION AND ORDER

she was not given as many opportunities to participate on task forces outside her department. She complains that stretch assignments were handled differently for herself and Bercot because they were not given backup coverage and they were not permitted to sit with the businesses, as was typical for younger ER specialists. Clemons complains that she and Bercot were only given assignments to teach NIKE classes in the less desirable cities around the country and the younger ER Specialists were sent to the more desirable cities.

During Clemons' deposition, she was asked numerous times if certain differences in treatment she received, such as assignments, training opportunities, or criticism, were due to her age. Clemons generally answered that she did not know.

Clemons once told Clingman that she hoped to become a Human Resources manager within two years. Clingman responded that older employees did not have the same opportunities at NIKE. After Tracy Healy was selected to be the ER Director instead of Clingman, Clingman commented that older employees did not have a future with NIKE. Clingman told Clemons that she did not get the promotion because of her age.

Clemons once objected when Clingman asked her to fill in for an ER Specialist who had left the office early. Clingman told Clemons that she had to understand that, as an older employee, Clemons had a different work ethic, that it was Clemons' choice to come in early and leave late, and that Clemons should not be judgmental of others that did not. Clingman explained in her deposition that many younger employees liked to telecommute and the older employees, herself included, preferred to work at the office.

Clemons contends that Clingman verbally abused her during some of their one-on-one meetings in 2005 by either raising her voice or using a tone of voice or body language which Clemons interpreted to mean that she should not respond but had to sit passively. Bercot

Page 5 - OPINION AND ORDER

overheard Clingman's raised voice and witnessed Clemons leaving Clingman's office looking flushed and near tears.

Bercot agrees with Clemons that he and she were not given the same opportunities in business-related travel, stretch assignments, and training as the younger employees. According to Bercot, participation in these opportunities is an important factor in advancement at NIKE. Clingman asked Bercot to tell Clemons to stop asking for training and travel opportunities.

Clemons never had a conversation with anyone in management about her concerns on the treatment of older workers because she knew it was not safe to do so. Clemons did not think there was anyone she could go to who was neutral and objective.

### III.    Task of Finding a Reasonable Accommodation for an Employee

Clemons was the ER Specialist assigned to manage the task of determining if a reasonable accommodation was possible for the general manager of the Beaverton Employee Store who was losing his sight and could no longer perform that job. After a six month effort, Clemons had not found a new position for the employee. Clingman became frustrated with the length of the process and took the task over from Clemons. Clemons and Clingman disagreed about what would be an appropriate reasonable accommodation. Clingman told Clemons to terminate the employee. Clemons replied that they needed more time to engage in the interactive process to find a position. Clingman gave Clemons another week and a half but told her to lay the case out for Healy and let her be the one making the final decision on whether to retain the employee or not. Clemons was eventually removed from the assignment.

### IV.    Clemons' Termination

Clemons combined a business trip to California with a visit to her parents in July 2005. Clingman was unable to reach Clemons during the week. She discussed the problem with

Page 6 - OPINION AND ORDER

Clemons on her return but was not satisfied with Clemons' response. Clingman then discussed the issue with Healy.

Clingman suspended Clemons on the afternoon of July 18, 2005 so Clingman could discuss the matter with her superiors: Healy, Director of Corporate Human Resources Bill Regan, and Vice President for Human Resources Wes Colman. They reviewed Clemons' performance history and the issues arising from her recent trip to California and approved the decision to terminate Clemons.

On July 20, 2005, Clingman asked Clemons to come to a meeting and gave her a letter terminating her. In the letter, Clingman objected to Clemons setting up the trip so that she would not be available for the entire week when the training only took place on two days. Clingman also complained about Clemons not returning her call when she was gone, Clemons' response when asked about not working on the Monday during the trip, her travel arrangements, and her failure to use a NIKE-provided calling card. Clingman concluded that Clemons arranged the trip in some respects to justify her personal agenda. Clingman referred to six prior written counseling or performance review documents which communicated expectations about Clemons' communication and professionalism and stated: "I have concluded that your inability to show that you understand or are committed to meeting the expectations for your job requires termination. Based on your actions, I am no longer confident with entrusting you with NIKE Employee Relations matters." Pedersen Decl. Ex. 1 at 174.

Clemons was 57 when she was terminated.

## LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The

initial burden is on the moving party to point out the absence of any genuine issue of material fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the evidence is viewed in the light most favorable to the nonmoving party. Universal Health Services, Inc. v. Thompson, 363 F.3d 1013, 1019 (9th Cir. 2004).

## DISCUSSION

I.   Age Discrimination

   A.   Disparate Treatment

Clemons alleges that NIKE treated her less favorably and terminated her because of her age, in violation of the Age Discrimination in Employment Act ("ADEA") and ORS 659A.030.

NIKE contends that Clemons offers neither direct nor circumstantial evidence of age discrimination. NIKE offers a long list of disciplinary or other negative events which defendants claim Clemons does not attribute to an age discriminatory motive.

NIKE acknowledges that Clemons believes she was terminated in part because of her age and was treated less favorably than similarly situated younger co-workers with respect to funds available for training, conducting out-of-town training, assignment of stretch projects, and covering for co-workers on extended leaves. NIKE contends that any difference in treatment prior to the termination was for legitimate, nondiscriminatory reasons: training funds were spent according to employees' needs; out-of-town training assignments were given to ER Specialists who support off-campus business groups; stretch assignments were made based on peoples' interests, availability, and input from managers and business partners; and coverage assignments were made based on the ER Specialists' workloads and interests. Relying on the Written

Page 8 - OPINION AND ORDER

Reminder, the inconsistent performance review, and the July 2005 trip problems, all occurring during Clemons' last year of employment, NIKE argues Clemons was terminated because she was not performing her job satisfactorily.

Clemons does not proffer direct evidence of age discrimination against her but contends that there is direct evidence of discriminatory animus at NIKE. She claims that Clingman herself perpetuated the notion that there was no possibility of career advancement for older employees. Clemons argues that there is circumstantial evidence of age discrimination which is sufficient to demonstrate that NIKE's explanation for all decisions is a pretext. Clemons claims that she was denied training, denied travel, denied remote access to email, denied meaningful stretch assignments, subjected to a heightened level of workplace scrutiny and discipline, and terminated for allegedly failing to communicate with her supervisor while on a business trip. According to Clemons, younger employees were treated differently in all of these aspects.

The Age Discrimination in Employment Act ("ADEA") makes it unlawful for an employer to hire or discharge any individual or otherwise discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of the individual's age. 29 U.S.C. § 623(a)(1). Protection under the ADEA extends to all individuals who are at least 40 years old. 29 U.S.C. § 631(a). The order and allocation of proof in cases under Title VII of the Civil Rights Act applies to age discrimination claims under the ADEA, which may be proven with direct or circumstantial evidence. Enlow v. Salem-Keizer Yellow Cab Co., Inc., 389 F.3d 802, 812 (9th Cir. 2004), cert. denied, 544 U.S. 974 (2005).

To establish a prima facie case of age discrimination, a plaintiff must produce enough evidence at summary judgment for the trier of fact to infer the fact at issue. The elements are that plaintiff: (1) was a member of the protected class (age 40-70); (2) was performing the job in a

Page 9 - OPINION AND ORDER

satisfactory manner; (3) was discharged; and (4) replaced by a substantially younger employee with equal or inferior qualifications. Nidds v. Schindler Elevator Corporation, 113 F.3d 912, 917 (9th Cir. 1996), cert. denied, 522 U.S. 950 (1997). The fourth element has been applied with flexibility. Id. (court erred by concluding that to establish a prima facie case, plaintiff was required to show that he was at least as qualified as his replacement).

> At summary judgment, the degree of proof necessary to establish a prima facie case is "minimal and does not even need to rise to the level of a preponderance of the evidence." Lyons v. England, 307 F.3d 1092, 1112 (9th Cir. 2002) (quoting Wallis v. J.R. Simplot Co., 26 F.3d 885, 889 (9th Cir. 1994)).
>
> If established, the prima facie case creates a rebuttable presumption that the employer unlawfully discriminated against the plaintiff. Id. The burden of production then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its action. Id. If the employer meets this burden, the presumption of unlawful discrimination "simply drops out of the picture." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993). The plaintiff then must produce sufficient evidence to raise a genuine issue of material fact as to whether the employer's proffered nondiscriminatory reason is merely a pretext for discrimination. Coleman v. Quaker Oats Co., 232 F.3d 1271, 1282 (9th Cir. 2000).

Dominguez-Curry v. Nevada Transp. Dept., 424 F.3d 1027, 1037 (9th Cir. 2005).

"When evidence to refute the defendant's legitimate explanation is totally lacking, summary judgment is appropriate even though plaintiff may have established a minimal *prima facie* case based on a McDonnell Douglas type presumption." Id. at 890-91. Plaintiff's own assertion of superior qualifications is insufficient without additional evidence. Blue v. Widnall, 162 F.3d 541, 546 (9th Cir. 1998). Plaintiff is not required, however to produce additional, independent evidence of discrimination at the pretext stage if the prima facie case raises a genuine issue of material fact regarding the truth of the employer's proffered reasons. Chuang v. University of California Davis, 225 F.3d 1115, 1127 (9th Cir. 2000). "[A] plaintiff can prove pretext in two ways: (1) *indirectly*, by showing that the employer's proffered explanation is

Page 10 - OPINION AND ORDER

unworthy of credence because it is internally inconsistent or otherwise not believable, or (2) *directly*, by showing that unlawful discrimination more likely motivated the employer." Noyes, 488 F.3d at 1170 (internal citation and quotation omitted). "[I]n the context of summary judgment, Title VII does not require a disparate treatment plaintiff relying on circumstantial evidence to produce more, or better, evidence than a plaintiff who relies on direct evidence." Cornwell v. Electra Central Credit Union, 439 F.3d 1018, 1030 (9th Cir. 2006) (noting tension with the Godwin v. Hunt Wesson, Inc., 150 F.3d 1217 (9th Cir. 1998), line of cases and their standard requiring specific and substantial circumstantial evidence of pretext).

       The standard for establishing a prima facie case of discrimination under Oregon law is identical to that used in federal law. Henderson v. Jantzen, Inc., 79 Or. App. 654, 657, 719 P.2d 1322 (expressly adopting formulation in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973) and Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981) as test for ORS Ch. 659 actions). Oregon courts rejected the burden-shifting mechanism applicable to federal claims. Hardie v. Legacy Health System, 167 Or. App. 425, 434-38, 6 P.3d 531 (2000). The Ninth Circuit held, however, that when analyzing Oregon's disability discrimination statute, it would apply the *McDonnell Douglas* burden-shifting analysis rather than Oregon's rule because the burden-shifting analysis was federal procedural law. Snead v. Metropolitan Property Casualty Insurance Co., 237 F.3d 1080, 1090-93 (9th Cir.), cert. denied, 534 U.S. 888 (2001).

       NIKE first attacks Clemons' prima facie case by claiming that she cannot demonstrate she was performing her job satisfactorily. I agree that there is significant evidence of coaching and discipline over the years, primarily based on Clemons' communication style. There is also evidence in the form of comments on performance reviews and emails from her business partners that Clemons was very competent in her knowledge of employment law. The threshold for

establishing a prima facie case is extremely low. I find that Clemons has at least established a factual issue on this point and conclude that she has established a prima facie case sufficiently to avoid summary judgment.

I now turn to whether NIKE's stated reason for the termination–poor performance–is a pretext for age discrimination. Clemons has evidence of different treatment in several respects concerning assignments and training for herself. Bercot corroborates her observations. Clemons was quite candid in her deposition that she did not know if the differences were due to age discrimination. Her attorney argues that if the reason is not age discrimination, what else could it be? NIKE provides numerous nondiscriminatory reasons, including people's experience and need for training, the location of the business groups to which the ER Specialist is assigned, and the current workload. Because there does appear to be differences, a jury needs to decide the actual motivation for the differences, either legitimate business reasons or discrimination. I also note the reports of Clingman's statements that older employees did not have the same opportunities at NIKE. Because Clingman is a manager, her statements are quite telling. Although Clemons' case is not a strong one, I conclude that she has established a factual issue that the reason for her treatment on the job and her ultimate termination is a pretext for age discrimination. I deny summary judgment on her ADEA and ORS 659A.030 age discrimination claims.

    B.    <u>Retaliation</u>

Clemons alleges that NIKE terminated her in violation of the ADEA in retaliation for her opposition to the age discrimination to which she was subjected.

NIKE argues that Clemons' ADEA retaliation claim fails because there is no evidence that she ever told management that she was discriminated against because of her age.

Page 12 - OPINION AND ORDER

Clemons contends that on numerous occasions, she raised concerns with Clingman about older workers, including herself, being treated differently in terms of raises, schedules, workload, travel, and assignments. She also notes that she did not start receiving corrective actions and written warnings until after her complaints.

To establish a prima facie case of retaliation under the ADEA, a plaintiff must prove that: (1) the plaintiff engaged in a protected activity; (2) the plaintiff suffered an adverse employment action; and (3) there was a causal link between the plaintiff's protected activity and the adverse employment action. Poland v. Chertoff, 494 F.3d 1174, 1179-80 (9th Cir. 2007).

In her deposition, Clemons testified that she never had a conversation with anyone in management about her concerns on the treatment of older workers because she knew it was not safe to do so. Clemons did not think there was anyone she could go to who was neutral and objective. In response to NIKE's argument that her ADEA retaliation claims fails for lack of a complaint to management, Clemons cites to several other portions of her deposition testimony. In them, Clemons testified she told Clingman: (1) she did not think it was fair to be given Melissa Marks' work when the person had a pattern of leaving early and Clingman replied that as an older worker, Clemons chose to come in early and leave late and should not be judgmental of others that did not make the same choice; and (2) Lisa Greenfield was allowed to telecommute without complaint but Clemons was treated harshly when asked to do it one time. Also, Clemons told Oilar: (1) she had a concern about handling work for a coworker, Scott Powell, who seemed unavailable, was not returning calls to business partners in a timely manner, and seemed to get away with things others could not get away with; and (2) Clemons had to report her time away from her desk in advance but others did not. Clemons also cites to her testimony that she asked a number of times to be considered for assignment to task forces.

None of the discussions Clemons relies on can be construed as a complaint about age discrimination. Clemons argues that because she was pointing out differences between her treatment and younger coworkers' treatment, the inference should be drawn. I disagree. Based on Clemons' logic, she could also be making a complaint of sex discrimination because Scott Powell is a male. Even Clingman's response about choosing, as an older worker, to work in the office longer hours is not enough to turn Clemons' complaint into opposition to age discrimination. Clingman explained the statement as a reference to the fact that the younger employees tended to prefer telecommuting and were not necessarily working fewer hours than those who chose to do all their work in the office. Clemons' statement concerned the unfairness of having to cover for somebody who Clemons believed was working less than full days. That is not a complaint about age discrimination.

I do not see anything in the evidence which raises a factual issue that Clemons was complaining about age discrimination. Consequently, her treatment cannot be in retaliation for opposing age discrimination. I grant summary judgment and dismiss the ADEA retaliation claim.

II.     Disability Discrimination Retaliation

Clemons alleges that she was retaliated against for opposing NIKE's conduct that Clemons reasonably believed was disability discrimination in violation of the Americans with Disabilities Act ("ADA").

Clemons does not claim to be disabled. Her retaliation claim is based on her disagreement with Clingman regarding NIKE's efforts to reasonably accommodate a blind employee. NIKE argues that the claim should fail because Clemons' complaints were too generic and not tied to an alleged ADA violation. NIKE also claims that Clemons never had

Page 14 - OPINION AND ORDER

enough information about the proposed accommodation to form a reasonable belief on whether it violated ADA.  Finally, NIKE argues that Clemons was only performing her job as an ER Specialist when she expressed opinions about possible accommodations, thus making the conduct not protected as a matter of law.

Clemons argues that she was in charge of this matter until she told Clingman that Clingman's instructions to terminate the employee, in the middle of the interactive process to find a reasonable accommodation, violated the ADA.  Clemons also contends that the nature of her position with NIKE does not shield the company from liability for an ADA retaliation claim.

The ADA prohibits retaliation against a person who "has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a).  To establish a prima facie ADA retaliation claim, a plaintiff must show: (1) he or she is engaged in a protected activity; (2) he or she suffered an adverse employment decision; and (3) there is a causal link between the protected activity and the adverse decision. Pardi v. Kaiser Foundation Hospitals, 389 F.3d 840, 849 (9th Cir. 2004).

NIKE relies on Nelson v. Pima Community College, 83 F.3d 1075 (9th Cir. 1996), in which a college's Assistant to the President for Affirmative Action and Equal Employment Opportunity was fired for performing her job in ways resulting in the president's disapproval, including intimidating employees, taking actions for which she had no authority, and trying to expand her role to be in the position of power rather than an assistant to the president.  The court granted summary judgment against the Title VII retaliation claim in which the plaintiff alleged she was fired for criticizing the college's affirmative action plan.  The court reasoned that "an employee does not receive special protection under Title VII simply because the employee

Page 15 - OPINION AND ORDER

handles discrimination complaints or works on affirmative action matters." Id. at 1082 (internal quotation omitted). Referring to another case, the court quoted, "The position was unique in that it required the occupant to act on behalf of his employer in an area where normally action against the employer and on behalf of the employees is protected activity." Id. (quoting Smith v. Singer Co., 650 F.2d 214, 217 (9th Cir. 1981) (granting summary judgment against corporation's equal opportunity officer's claim for Title VII retaliation which alleged he was fired because he filed complaints with government agencies alleging discriminatory practices after he became disillusioned with employer's lack of commitment to reforming affirmative action program)).

The issue was also addressed in McKenzie v. Renberg's Inc., 94 F.3d 1478 (10th Cir. 1996), cert. denied, 520 U.S. 1186 (1997), in which a Personnel Director allegedly was fired in retaliation for bringing overtime violations to the attention of the company attorney and president. The court affirmed the trial court's entry of judgment as a matter of law against the Fair Labor Standards Act ("FLSA") retaliation claim, nullifying plaintiff's favorable jury verdict. The court held that the plaintiff

> never crossed the line from being an employee merely performing her job as personnel director to an employee lodging a personal complaint about the wage and hour practices of her employer and *asserting* a right adverse to the company. [Plaintiff] did not initiate a FLSA claim against the company on her own behalf or on behalf of anyone else. Rather, in her capacity as personnel manager, she informed the company that it was at risk of clams that might be instituted by others as a result of its alleged FLSA violation. In order to engage in protected activity under § 215(a)(3), the employee must step outside his or her role of representing the company and either file (or threaten to file) an action adverse to the employer, actively assist other employees in asserting FLSA rights, or otherwise engage in activities that reasonably could be perceived as directed towards the assertion of rights protected by the FLSA.

Id. at 1486.

Clemons' factual situation is not distinguishable from McKenzie. In both, an employee whose duties include working on issues concerning various employee statutory rights, informed company management that they believed there might be a statutory violation. McKenzie concerned whether pay complied with FLSA overtime rules. Clemons raised the flag that she did not think adequate effort was put into finding a reasonable accommodation under the ADA. I will follow the analysis in McKenzie and Nelson and conclude that Clemons was performing her job and was not engaging in a protected activity under the ADA. Accordingly, I grant summary judgment and dismiss the ADA retaliation claim.

III.   Wrongful Discharge

Clemons contends that NIKE wrongfully discharged her in retaliation for her opposition to its discriminatory acts. NIKE contends that the wrongful discharge claim fails because there is no evidence that Clemons exercised a job-related right, namely to oppose unlawful discrimination.

For the reasons stated above, Clemons did not oppose unlawful discrimination. I grant summary judgment and dismiss the wrongful discharge claim.

V.   Intentional Infliction of Emotional Distress

Clemons alleges that Clingman committed the tort of intentional infliction of emotional distress in her actions towards Clemons. She also alleges that NIKE is vicariously liable for Clingman's actions.

Defendants move for dismissal of this claim, arguing there is no evidence Clingman engaged in conduct outrageous enough to support this tort.

Clemons contends that Clingman yelled at her in one-on-one meetings, that Clingman made comments to her with the only purpose to emotionally distress her, that Clingman could

Page 17 - OPINION AND ORDER

give no specific examples concerning her accusations on August 9, 2004, that she was accused of treating an African American employee unprofessionally, that she was harangued in meetings, that her email was monitored without her knowledge, that she was required to get permission to do her job when she needed to visit business partners, that her legitimate request to work one day at home was questioned, that her Individual Development Plan was altered, and that she was set up for termination. Clemons argues that this evidence is adequate to prove the tort of the intentional infliction of emotional distress.

> The tort of intentional infliction of emotional distress contains the following elements:
>
> (1) the defendant intended to inflict severe emotional distress on the plaintiff, (2) the defendant's acts were the cause of the plaintiff's severe emotional distress, and (3) the defendant's acts constituted an extraordinary transgression of the bounds of socially tolerable conduct.

McGanty v. Staudenraus, 321 Or. 532, 543, 901 P.2d 841 (1995). Intent is defined to mean "where the actor desires to inflict severe emotional distress, and also where he knows that such distress is certain, or substantially certain, to result from his conduct." Id. at 550 (emphasis omitted). The nature of the relationship between the parties affects the type of conduct that is considered actionable. Id. at 548.

"Conduct that is merely rude, boorish, tyrannical, churlish and mean [is insufficient to be actionable, and] . . . insults, harsh or intimidating words, or rude behavior ordinarily [do not] result in liability even when intended to cause distress." Watte v. Edgar Maeyens, Jr., 112 Or. App. 234, 239, 828 P.2d 479, 481 (1992) (quoting Hall v. The May Dept. Stores, 292 Or. 131, 135, 637 P.2d 126, 129 (1984)). In addition, Oregon cases which have allowed claims for intentional infliction of emotional distress to proceed typically involve acts of psychological and physical intimidation, racism, or sexual harassment. See Babick v. Oregon Arena Corp., 333 Or.

401, 413, 40 P.3d 1059 (2002) (defendant's release of intoxicated and violent concertgoers who had been detained by plaintiffs presented a threat of imminent physical harm that was presumed grave); Kraemer v. Harding, 159 Or. App. 90, 976 P.2d 1160 (1999) (continued accusations that a school bus driver was a child sex abuser after multiple investigations concluded that no inappropriate conduct occurred); Wheeler v. Marathon Printing, Inc., 157 Or. App. 290, 974 P.2d 207 (1998) (co-worker continued harassment including sexual remarks even after plaintiff attempted suicide); Lathrope-Olson v. Dept. of Transportation, 128 Or. App. 405, 408, 876 P.2d 345 (1994) (calling a Native American woman a squaw, telling her that a squaw was supposed to walk behind her man, stating that all women were good for was between their legs, locking her out of the work van in the rain and snow, and threatening to push her into the path of oncoming vehicles); Mains v. II Morrow, Inc., 128 Or. App. 625, 877 P.2d 88 (1994) (daily physical assaults and sexual comments by supervisor); Franklin v. Portland Community College, 100 Or. App. 465, 787 P.2d 489 (1990) (supervisor called an African-American male by the name "boy," issued false reprimands, shoved him, locked him in an office, and suggested that he apply elsewhere for employment).

Whether conduct constitutes an extraordinary transgression of the bounds of socially tolerable conduct is a question of law. Harris v. Pameco Corp., 170 Or. App. 164, 171, 12 P.3d 524 (2000)

Clemons has proffered evidence that Clingman yelled at her in meetings behind closed doors and began treating her in a way that is not uncommon for employees whose performance is considered unsatisfactory, including closer than usual supervision. Although this would not make for a stress-free work environment, it is not the type of psychological and physical intimidation that occurred in the cases I cited above. I also see no evidence that the difficult

Page 19 - OPINION AND ORDER

interactions occurred on a frequent or unrelenting basis. Accordingly, I find that Clingman's conduct was not an extraordinary transgression of the bounds of socially tolerable conduct and grant summary judgment dismissing the intentional infliction of emotional distress claim.

## CONCLUSION

Defendants' Motion for Summary Judgment (#32) is granted in part.

IT IS SO ORDERED.

Dated this        28th           day of September, 2007.

                                              /s/ Garr M. King
                                             Garr M. King
                                             United States District Judge